**Felipe DIAZ**

v.

**James A. COLLINS.**

**Civ. A. No. 6:94cv122.**

United States District Court, E.D. Texas, Tyler Division.

Dec. 20, 1994.

Felipe Diaz, pro se.

Noah S. Martinez, pro se.

Louis Victor Carrillo, Asst. Atty. Gen., Atty. General's Office, Austin, TX, for James A. Collins.

Jolene Yellowquill, pro se.

### MEMORANDUM OPINION AND ORDER OF DISMISSAL

GUTHRIE, United States Magistrate Judge.

The Plaintiff Felipe Diaz, an inmate of the Texas Department of Criminal Justice, Institutional Division proceeding *pro se* and *in forma pauperis,* filed this civil action under 42 U.S.C. § 1983 complaining of alleged violations of his civil rights during his confinement in the prison. The lawsuit was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrates.

The lawsuit was originally filed by two inmates, Diaz and a prisoner named Noah Martinez. An evidentiary hearing was conducted pursuant to *Spears v. McCotter,* 766 F.2d 179 (5th Cir.1985), on May 23, 1994.

At this hearing, the Plaintiffs testified that they followed a Native American religion and their right to practice this religion was being infringed. I also received testimony from prison officials that a new Administrative Directive governing religious freedom had been put into place. The Plaintiffs agreed to a stay of the case so that they could attempt to utilize the new prison procedures.

Martinez subsequently requested that he be dismissed from the lawsuit. On July 20, 1994, Diaz filed a status report stating that the new prison procedures did not adequately protect his right to practice his religion freely. The Defendant James Collins was ordered to answer the lawsuit and did so. An evidentiary hearing was scheduled pursuant to *Flowers v. Phelps,* 956 F.2d 488, *modified in part on other grounds* 964 F.2d 400 (5th Cir.1992), for the purpose of making recommended findings of fact and conclu-

sions of law. *See* 28 U.S.C. § 636(b)(1)(B). The parties were advised of their right to call and cross-examine witnesses, and the hearing was held without objection on December 7, 1994.

At the *Flowers* hearing, the parties consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding. Rather than simply making recommendations for findings of fact and conclusions of law, therefore, I hereby make these findings and conclusions, and enter judgment in accordance with the consent of the parties. 28 U.S.C. § 636(c).

### Findings of Fact

In a trial before the bench, the Court must find the facts specially and make conclusions of law. Rule 52(a), Fed.R.Civ.P. This Rule recognizes and rests upon the unique opportunity afforded the trial court judge to evaluate the credibility of witnesses and to weigh the evidence. *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 855, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982).

In this case, I have examined the exhibits and considered the testimony of the parties and witnesses in the cause. I have also noted the demeanor of the parties as they appeared in the courtroom. After careful review of all of the evidence presented, I have found the following as facts:

The Plaintiff Felipe Diaz is a Native American prisoner of the Texas Department of Criminal Justice, Institutional Division, confined at the Coffield Unit of TDCJ–ID. He is an adherent of Native American religious beliefs.[1] As such, Diaz wishes to be able to worship in traditional ways. These ways include the use of pipes, whose smoke transmits messages to the Great Grandfather; medicine pouches, which keep sacred and revered objects close to a person at all times; a headband; and the wearing of long hair, which is to be cut only in times of sorrow or grief.[2]

Prior to April of 1994, the TDCJ–ID regulation on religious liberty was Administrative Directive 07.30 (rev. 1, dated August 16, 1992). Although not specifically required by this regulation, TDCJ–ID had a policy of requiring adherents to Native American religions to produce documentation of their status as Native Americans before they could be allowed to practice these religions. This policy was found to be unworkable and done away with.

On April 14, 1994, the prison revised this directive. The revision specifically addresses the needs of Native Americans confined in the prison. Under the terms of the revised directive, Native American inmates are allowed to possess a headband, a shell, a medicine pouch, seven sacred stones, a feather, and such other objects as are permitted by the Unit Warden and the Unit Chaplain. These items must be stored in the inmate's cell and may be removed for ceremonial worship only. The inmates are also allowed to have access to ceremonial items such as drums, pipes, tobacco, a gourd, sage, sweetgrass, and cedar; these items are maintained by the Unit Chaplain and are made available to inmates when required.

The revised directive also states that to obtain personal religious items, the inmate must identify a vendor capable of providing these items. These items must be ordered by the inmate and paid for from the inmate's trust account.

The revised directive stipulates that the inmate's medicine pouch must not be touched by anyone other than the inmate, although the inmate can be required to open it and reveal its contents at any time for security purposes. Diaz stated that he wished to be allowed to carry it on his person, but the directive stipulates that it must be kept in the cell.

Diaz sought assistance from Chaplain Pickett, the former Chaplain of the Coffield Unit, in obtaining religious items, but was told that he would have to purchase the items from a

---

1. Diaz referred to his faith as the "Nahuatli religion." I will accept this designation, although strictly speaking, Nahuatli is the name of a language rather than a religion.

2. Although Diaz's complaint also refers to the denial of sweat lodges, he expressly dropped this claim at the trial.

commercial supplier.[3] He then complained to Warden Nathaniel Quarterman about the restrictions on his religious practices. About a month before the trial, Warden Quarterman told him that Chaplain Pickett was no longer there and that the Coffield Unit had a new chaplain, Mr. Cuyler.

Warden Quarterman arranged for a meeting with Diaz, Chaplain Cuyler, and himself to discuss the problem. At this meeting, Quarterman and Cuyler told Diaz that they would help him in obtaining the religious items which he needed. Quarterman told Diaz that he could obtain the artifacts from Taylor (see footnote 3), but she currently was out of state. As of the date of the trial, Diaz had not been able to obtain the items he wanted.

Diaz further said that he wished to grow his hair long because, in the Native American tradition, hair is cut only at the death of a loved one. However, he conceded that he had recently cut his hair in order to be moved to a section of the prison where more freedom was available. Diaz is identified by TDCJ–ID documents as a confirmed member of the Mexican Mafia prison gang and is currently housed in administrative segregation.

TDCJ–ID regulations require inmates to cut their hair. These regulations are based on the security concerns that inmates may hide contraband in long hair, it takes longer to conduct searches of inmates with long hair, inmates may more readily change their appearance by cutting their hair, the keeping of hair short instills a sense of discipline among inmates, and allowing some inmates to grow their hair long could cause resentment and copying among the rest of the inmate population. As a result, inmates are required to keep their hair within approved lengths or face disciplinary action. These facts were testified to by the Plaintiff, TDCJ–ID Director of Chaplains Jerry Groom, Warden Quarterman, and Jerry Petersen, Deputy Director for TDCJ–ID Operations.

---

**3.** Diaz stated in Court that commercial purchases would not be acceptable under his religious beliefs. However, Jerry Groom, the Director of Chaplains for TDCJ–ID, assured the Court that there would be no problem in having

I also received testimony from Sgt. William Meyer, a gang intelligence officer, to the effect that the Mexican Mafia prison gang was seeking to use the "Nahuatli religion" as a cover for its illegal activities. However, there was no evidence presented that the Plaintiff's religious beliefs were not sincerely held. For purposes of this opinion, I do not question the sincerity of Diaz's religious beliefs. *See United States v. Ballard,* 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944).

*Legal Standards and Analysis*

I. *The History of Religious Freedom in America*

The search for religious freedom is a cornerstone of this country's foundation. The 1786 Virginia Statute of Religious Liberty, written by Thomas Jefferson, states that

Whereas, Almighty God has created the mind free; that all attempts to influence it by temporal punishments or burdens, or by civil incapacitations, tend only to beget habits of hypocrisy and meanness ... that our civil rights have no more dependence on our religious opinions, than our opinions on physics or geometry ... that it is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt acts against peace and good order ...

[Therefore] be it enacted by the General Assembly, that no man shall be compelled to frequent or support any religious worship, place or ministry whatsoever, nor shall be enforced, restrained, molested, or burdened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but that all men shall be free to profess, and by argument to maintain, their opinion in matters of religion, and that the same shall in no wise diminish, enlarge, or affect their civil capacities.

12 Hening, *Statutes at Large of Virginia* (1823), p. 84ff.

---

Diaz's spiritual advisor, a woman named Glenda Taylor (Little Hawk), provide these items for him so long as they could be inspected for contraband and were sent through the Chaplain's office rather than directly to the inmate.

James Madison's Memorial and Remonstrance on Religious Liberty, delivered in 1785, states that

> [W]e hold it for a fundamental and undeniable truth, that religion or the duty which we owe our Creator and the manner of discharging it, can be directed only by reason and conviction, not by force or violence. The religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. ... It is the duty of every man to render to the Creator such homage, and such only, as he believes to be acceptable to him.

II Writings of James Madison, pp. 183–191.

Madison's Remonstrance quoted from the Virginia Bill of Rights (June 12, 1776), Section 16, which stated

> That religion or the duty which we owe our Creator and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and therefore all men are equally entitled to the free exercise of religion, according to the dictates of conscience.

The Massachusetts Bill of Rights of 1780, Article II, states that

> It is the right as well as the duty of all men in society, publicly, and at stated seasons, to worship the Supreme Being, the great Creator and Preserver of the Universe. And no subject shall be hurt, molested, or restrained, in his person, liberty or estate, for worshipping God in the manner and season most agreeable to the dictates of his own conscience, or for his religious profession of sentiments, provided he does not disturb the public peace, or obstruct others in their religious worship.

The Northwest Ordinance of 1787, codified in 1 Stat. 50 (August 7, 1789) was enacted by Congress to govern the territories northwest of the Ohio River. Article I of the Ordinance provides that

> No person, demeaning himself in a peaceable and orderly manner, shall ever be molested on account of his mode of worship or religious sentiment in the said territory.

The first clause of the First Amendment to the United States Constitution provides that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. Amendment I, U.S. Constitution. Given this history, it is fitting that the first freedom protected in the Bill of Rights is that of religious liberty.

## II. The Religious Freedom Restoration Act

The United States Supreme Court, recognizing the role of religious freedom in America, crafted a test for determining claims of infringements upon this liberty. This test, known as the "compelling governmental interest" test, states that a regulatory burden upon a person's right freely to practice his religion may be justified only by a compelling state interest in the regulation of a subject within the government's power to regulate. *See Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *see also Hernandez v. C.I.R.,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989).

In 1990, however, the Supreme Court handed down a decision called *Employment Div., Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). This decision abolished the compelling governmental interest test in free exercise claims where a law is neutral and of general applicability, saying that the law need not be justified by a compelling governmental interest even if it has the incidental effect of burdening a religious practice. *Smith,* 494 U.S. at 886, 110 S.Ct. at 1604; *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* —— U.S. ——, ——, 113 S.Ct. 2217, 2225, 124 L.Ed.2d 472 (1993).

Congress reacted to this decision by passing the Religious Freedom Restoration Act of 1993 (the Act), codified at 42 U.S.C. 2000bb et seq. The stated purpose of the Act was to overrule the decision in *Smith.* Section bb–1 of the Act provides as follows:

> (a) **In general.** Government shall not substantially burden a person's exercise of religion even if the burden results

from a rule of general applicability, except as provided in Subsection (b).

**(b) Exception.** Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person

(1) is in furtherance of a compelling governmental interest, and

(2) is the least restrictive means of furthering that compelling governmental interest.

**(c) Judicial Relief.** A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under Article III of the Constitution.

In *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), the Supreme Court stated that prison regulations affecting the right of prisoners to free exercise of religion will be upheld if they are reasonably related to a legitimate penological interest. Several courts have held that the enactment of the Religious Freedom Restoration Act also served to overrule *O'Lone*. See *Brown–El v. Harris*, 26 F.3d 68, 69 (8th Cir.1994); *Messina v. Mazzeo*, 854 F.Supp. 116, 134 (E.D.N.Y.1994); *Campos v. Coughlin*, 854 F.Supp. 194, 206 (S.D.N.Y.1994). This interpretation is buttressed by the fact that Congress considered and rejected an amendment to the Act creating an exception for prisons. See Congressional Record, October 27, 1993 (daily edition), p. S14468; Senate Rep. No. 103–111, 103rd Congress, 1st Session (1993), U.S.Code Cong. & Admin.News 1993, p. 1892.

### III. Application of the Act

#### A. Hair

Diaz complains that he is not permitted to grow his hair long, as required by his religion. In a pre-Act case, the Fifth Circuit has ruled on the question of TDCJ–ID inmates being allowed to grow their hair for religious reasons. *Powell v. Estelle*, 959 F.2d 22 (5th Cir.1992). However, *Powell* relies on *O'Lone*; thus, the question must be addressed under the Act.

In *Powell*, the Fifth Circuit identified the state interests in having inmates cut their hair. These interests include prison security, identification of inmates, the impact of long hair on industrial safety, and general concerns about hygiene. At the trial in this cause, competent and credible witnesses testified that allowing inmates to grow long hair could give rise to serious security concerns. These concerns include considerations that inmates may hide contraband in long hair, that it takes longer to conduct searches of inmates with long hair, that inmates may more readily change their appearance by cutting their hair, that keeping hair short instills a sense of discipline among inmates, and that allowing some inmates to grow their hair long could cause resentment and copying among the rest of the inmate population. I have concluded as a matter of law that these security concerns are not pretextual, but are compelling governmental interests within the meaning of the Act.

The next issue to be examined is whether the hair regulations are the least restrictive means available to achieve these compelling interests. In *Felix v. Rolan*, 833 F.2d 517 (5th Cir.1987), the Fifth Circuit faced a situation where an inmate complained that he was required to use his committed name, which he found religiously offensive to him, when signing into the law library, although he was permitted to use his Muslim name as well. The Court stated that requiring the inmate to use his committed name when signing in, even as an alias, was the least restrictive means of achieving the prison interests of order, security, and administrative efficiency. *Felix*, 833 F.2d at 519.

In *Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986), an Orthodox Jew and ordained rabbi suffered punishment for wearing a yarmulke in violation of an Air Force regulation prohibiting the wearing of headgear indoors, other than by armed security police in performance of their duties. The Plaintiff contended that this punishment violated the Free Exercise Clause of the First Amendment, but the Su-

preme Court disagreed, stating that the challenged regulation "reasonably and evenhandedly regulate[s] dress in the interest of the military's perceived need for uniformity." *Goldman*, 475 U.S. at 510, 106 S.Ct. at 1314.

Similarly, in *Sherwood v. Brown*, 619 F.2d 47 (9th Cir.1980) a naval officer took the vows of the Sikh religion. As part of this religion, he was required to wear a turban made of cotton cloth. This action ran afoul of a naval regulation precluding the wearing of turbans, and Sherwood was court-martialed.

The Ninth Circuit held that the Navy's interest in safety was sufficient to meet the compelling state interest requirement, and that because all naval personnel are subject to military duties implicating the safety rationale, no less restrictive alternative existed. Thus, the Court held that Sherwood had not stated a viable cause of action. *Sherwood*, 619 F.2d at 48.

Here, the Texas prison system has adequately shown a compelling state interest in requiring inmates to cut their hair. The question then becomes one of whether the regulation is the least restrictive means available to achieve these interests. 42 U.S.C. § 2000bb–1(b)(2).

■ The potential of hiding contraband in long hair cannot be vitiated except through a regulation that hair be kept short. Similarly, the fact that an inmate with long hair, including facial hair, can drastically alter his appearance by cutting his hair and shaving cannot be countered except by requiring that inmates keep their hair short. I have concluded as a matter of law that TDCJ–ID's hair regulation is the least restrictive means available to further these compelling govern-

mental interests. For this reason, Diaz's Religious Freedom Restoration Act claims concerning TDCJ–ID's hair regulations are without merit.[4]

### B. The Medicine Pouch

■ Diaz stated that he wished to order a medicine pouch, but that he could not because he was required to purchase the pouch from a commercial vendor, which he said would not be proper. The testimony at trial revealed that this interpretation was simply a misunderstanding of the regulations. Although these regulations state that religious artifacts must be obtained from a "vendor," Chaplain Groom and Warden Quarterman both testified that the items may be obtained from non-commercial sources. Groom and Quarterman specifically said that Diaz could obtain a medicine pouch from Taylor, his spiritual advisor, as was his desire. The only stipulations were that the pouch had to be sent through the unit warden's office and that Diaz had to allow it to be visually inspected for contraband.[5] These stipulations are reasonable within a prison environment and do not substantially burden Diaz's right freely to practice his religion. *See* 42 U.S.C. § 2000bb(b)(1) (requiring a showing of a "substantial burden" to trigger the Act).[6]

■ Neither does the prison policy of requiring the pouch to be stored in the inmate's cell amount to a substantial burden on Diaz's religion. Taylor, the Plaintiff's spiritual advisor, testified that not all Native Americans are taught to wear a medicine pouch at all times, but that this depends on how orthodox the person is in his or her faith. She said that not wearing the pouch causes a problem for the person in that

---

4. Diaz also complained at trial that unlike males, female inmates are not required to wear their hair short. The Fifth Circuit has considered and rejected a claim that TDCJ–ID's disparate hair regulations are a violation of equal protection. *Hill v. Estelle*, 537 F.2d 214 (5th Cir.1976). To the extent that Diaz raises such a claim, it is without merit.

5. Because the Native American religions do not permit the pouch to be touched by anyone other than the wearer, the TDCJ–ID Administrative Directive prohibits officers from touching it.

6. In *Brown, et al. v. Borough of Mahaffey, et al.*, 35 F.3d 846 (3rd Cir.1994), the Third Circuit held that where governmental action intentionally interferes with the free exercise of religion, the relevant question is not whether the burden on religious exercise was "substantial," but whether the defendants intended to impose a burden. *Brown*, 35 F.3d at 847–48. Under this test, Diaz's claim must fail; the evidence shows that the prison officials have not intended to burden his free exercise of religion, but have gone to considerable lengths to accommodate him within the parameters of prison requirements.

wearing the pouch satisfies a need to connect with nature, and likened wearing the medicine pouch to a Christian wearing the crucifix to satisfy the need to connect with Christ. Diaz did not testify that he must wear the pouch at all times to satisfy the requirements of his religion, but simply said that he was unable to obtain one to have in his possession.

The evidence at trial showed that Diaz, who is confined in administrative segregation, remains in his cell for 22 to 23 hours per day. When he is able to receive a medicine pouch, he will be able to wear it in his cell. The requirement that the pouch be stored in the cell will thus have little effect on him. I have concluded as a matter of law that the TDCJ–ID regulations governing the receipt and storage of medicine pouches does not constitute a substantial burden on Diaz's right to practice his religion.

### C. The Headband

Diaz stated that he wanted to have a Native American headband. The evidence offered at the hearing, however, including testimony from Glenda Taylor, showed that the headband had more cultural than religious significance; she said that Native Americans wore the headbands to connect themselves with their culture. In his pleadings, Diaz states that the headband continually reminds the wearer of his duties to the Creator, to fellow humans, his family, himself, and his community; it also reminds the wearer to be thankful for health and wellbeing, and to pray for the people. He likened the headbands to ceremonial headgear worn by Christian, Jewish, and Muslim religious leaders.

The TDCJ–ID revised administrative directive governing religious artifacts specifically permits Native American inmates to possess headbands, which must be stored in the cell. Administrative Directive 07.30(V)(B)(4) (rev.2, April 14, 1994). Taylor conceded that headbands posed a potential security problem within the penitentiary because of the possibility of concealing contra-

band, including weapons. In Diaz's case, he is confined to his cell for 22 to 23 hours per day and will be able to wear his headband during this time. I have concluded as a matter of law that the TDCJ–ID regulation governing religious headbands does not substantially burden the practice of the Native American religion and that this regulation is founded upon the compelling state interest to maintain security and minimize the carrying of contraband within the prison.

### D. The Prison's Accommodation of the Native American Religions

There are about 30 declared practitioners of Native American religions confined in TDCJ–ID, which has over 100,000 inmates. Despite this low number, the evidence shows that prison officials have taken substantial steps to accommodate the practice of these traditional religions. The Administrative Directive on religious freedom of inmates specifically mentions the Native American religions and provides that its adherents may have certain identified artifacts, as well as such other items as the Unit Warden and Chaplain may allow. The seven Native Americans at the Coffield Unit, where Diaz is confined, are permitted to have weekly worship ceremonies, at which the unit chaplain makes available a sacred pipe which he keeps in his possession.[7]

In the instant case, Warden Quarterman has met with Chaplain Cuyler and the Plaintiff Felipe Diaz in an effort to secure religious items for Diaz. Far from attempting to inhibit the practice of religion, the Texas prison system is taking steps to meet the religious needs of its Native American inmates, and this Court anticipates that these steps will continue.

### Conclusion

The Supreme Court has held that laws and regulations are made for the government of actions, and while they cannot interfere with religious belief and opinion, they may interfere with practices. *Bowen v. Roy,* 476 U.S. 693, 699, 106 S.Ct. 2147, 2152, 90 L.Ed.2d 735 (1986); *Reynolds v. U.S.,* 98 U.S. 145, 163–

---

**7.** Diaz testified that he has not sought to attend a pipe ceremony because he would only attend if his spiritual counselor advised him to.

66, 25 L.Ed. 244 (1878) (citing 1786 Virginia Statute of Religious Liberty). To withstand constitutional scrutiny, however, such laws and regulations must be designed to achieve a compelling governmental purpose and narrowly tailored to that end. *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 717–18, 101 S.Ct. 1425, 1431–32, 67 L.Ed.2d 624 (1981); Religious Freedom Restoration Act, 42 U.S.C. 2000bb.

In this case, the State of Texas has passed certain specific rules and regulations governing the actions of its prison inmates in exercising their right to the religion of their choice. To the extent that these rules and regulations inhibit the free exercise of religion, they do so in furtherance of a compelling state interest and in a fashion which is narrowly tailored to meet this end. It is accordingly

ORDERED that the Plaintiff shall take nothing on his lawsuit and that judgment in this action is entered for the Defendant. It is further

ORDERED that all motions by any party which may be pending in this lawsuit are hereby DENIED. All parties shall bear their own costs.