**Billy J. BLANKEN, Plaintiff,**

v.

**OHIO DEPARTMENT OF REHABILITATION AND CORRECTION, et al., Defendants.**

**No. C–2–94–991.**

United States District Court,
S.D. Ohio,
Eastern Division.

Oct. 30, 1996.

---

1361

OPINION AND ORDER

GEORGE C. SMITH, District Judge.

Plaintiff Blanken is a correctional officer who works for Defendant Ohio Department of Rehabilitation and Correction ("ODRC"). Blanken practices Native American Spirituality, and believes that growing one's hair at the base of the neck is essential to obtaining spiritual knowledge and wisdom. ODRC's Employee Grooming Policy (the "Policy") requires male uniformed personnel such as Blanken to keep their hair "collar length or shorter in the back."

The conflict between the ODRC Policy and Blanken's desire to keep his eight-inch ponytail has brought the parties before this Court.[1] Both sides move for summary judgment (Docs. 9 & 14).[2] Based on the following, the Court grants defendants' summary judgment motion and denies plaintiff's summary judgment motion.

I.

A. Billy J. Blanken, Jr.

Plaintiff Blanken has worked for ODRC since July 1988 as a Food Service Coordinator 1 at the Orient Correctional Institution ("OCI"). Blanken supervises about thirty inmates who work in the kitchen area. Blanken assures that inmates are in proper uniform, clean, follow proper sanitation procedures, and ration only the correct amount of food to each inmate.

Blanken practices Native American Spirituality and is a member of the Hokshichankiya Society. He identifies four central tenets of Native American Spirituality: the Sweat Lodge, the Sacred Pipe, the Vision Quest, and the growth of hair. According to Blanken, no one of these tenets has any more importance than any other, and Native American Spirituality does not mandate any one of them. As to hair growth, Blanken states as follows:

According to Native American Spirituality, and my sincerely held religiously held be-

William J. O'Malley, Columbus, OH, for plaintiff.

Cheryl F. Jorgensen, Ohio Attorney General—2, Mary Beth Foley, Ohio Attorney General—2, Employment Law Section, Columbus, OH, for defendants.

1. Blanken asserts claims under the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb, and the Free Exercise Clause of the First Amendment to the U.S. Constitution under 42 U.S.C. § 1983.

2. Defendants do not argue that the RFRA is unconstitutional. The U.S. Supreme Court recently granted certiorari to decide this issue. *Boerne v. Flores,* —— U.S. ——, 117 S.Ct. 293, —— L.Ed.2d —— (1996).

liefs as a practitioner of Native American Spirituality, a person's hair is an organ, a manifestation of being and a symbol of growth, strength and individuality. The human hair is the only thing that passes from the outside world, through our flesh, and into the human body. Thus, I believe and it is believed that the human hair can pick up the messages of the spirits in the wind. Because the hairs at the base of the neck are rooted directly to the spinal column, I believe and it is believed that these hairs provide a direct link between the spirits in the wind and the human brain. Therefore, to cut these hairs would sever this vital link between myself and the spirits, and to force me to cut these hairs would substantially burden my religious beliefs.

Blanken Aff. at ¶ 9.

Blanken says that he first decided to allow his hair to grow after his experiences during a Vision Quest. A Vision Quest is "a practice of going alone to the highest hilltop or mountain with one's sacred pipe and remaining there for a chosen number of days and nights ... in which one fasts and prays and hopes for the spirits to bring information, wisdom and knowledge to give direction and enlightenment." Blanken Aff. at ¶ 8; *accord United States v. Means*, 627 F.Supp. 247, 253 n. 3 (D.S.D.1985) ("A Vision Quest is a ceremony involving fasting, praying and a calling to a supreme being to direct the seeker by a vision.") (internal quotations omitted).

I fasted for two days and I received my vision after the second evening. It was during the night. And I had went off to sleep and this is when the vision came to me, much like a dream. And it was telling me how we all are one in the circle of life. And that's pretty much when I made up my mind that Native American spirituality was the right direction for me. I was also told at that time that the hair that connects the spinal column is a way for me to receive messages from the spirits through the wind.

Blanken Dep. at 41–42.

## B. ODRC Employee Grooming Policy

When Blanken first joined ODRC at OCI in 1988, ODRC had no formal grooming policy. Director George Wilson appointed a committee on January 11, 1990 to develop a formal policy on uniforms. After consulting with the union representing uniformed staff, the Ohio Civil Service Employees Association, ODRC adopted the Policy on June 1, 1992. ODRC intended that the Policy cause "employees [to] present a professional and dignified image, commensurate with their responsibilities, in order to instill confidence on the part of the public and establish respect from the inmates, parolees, furloughees, and probationers." *See* Policy at p. 2 ("IV. Policy"). The Policy specifically addresses hairstyle as follows:

2. Hairstyle shall not interfere with the wearing or the proper positioning of the uniform cap. Hair shall be styled above the eyebrow in the front. Certain hairstyles may be considered incompatible with a professional and dignified appearance.

a. Male employees' hair shall be evenly cut and neatly groomed. Hair must be cut in such a style that it does not cover the entire ears on the sides and is collar length or shorter in the back.

b. Facial hair must be neatly and evenly trimmed. Facial hair may be prohibited where it prevents the proper wearing and sealing of gas masks and self-contained breathing apparatus for those employees that are required to do so.

c. Female employees' hair may not be worn below the shoulders and must be off of the collar when wearing the uniform cap. Female employees with hair longer than shoulder length may pull it back, pin it up, etc., to achieve this.

Policy at p. 2.

After ODRC adopted the Policy, OCI's Deputy Warden of Administration notified Blanken that he would have to cut his hair or face termination. ODRC's Acting Chief Counsel indicated that ODRC would make no exceptions to the Policy, religious or otherwise.

Blanken filed the instant action on October 14, 1994, against the ODRC and the Warden

of OCI, Jack Littlefield, seeking injunctive relief under 42 U.S.C. § 1983, the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb ("RFRA"), and Ohio Rev.Code § 4112.99. The Court denied Blanken's motion for a preliminary injunction on September 20, 1995, in part because Blanken did not show a substantial likelihood of success on the merits. The parties now move for summary judgment.

## II.

Fed.R.Civ.P. 56(c) sets forth the procedure for addressing a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The Court must view the evidence in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby*, *Celotex* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir.1989). The court in *Street* identified several important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

█ In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257, 106 S.Ct. at 2514–15). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356). Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.; see also Tiemeyer v. Community Mut. Ins. Co.*, 8 F.3d 1094, 1098 (6th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1371, 128 L.Ed.2d 48 (1994). That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

## III.

The RFRA provides a statutory claim for individuals whose religious exercise is substantially burdened by the government. 42 U.S.C. § 2000bb(b). Congress enacted the RFRA in response to the U.S. Supreme Court's decision in *Employment Div., Dept. of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) In *Smith* the Court inquired whether a governmental burden on religiously motivated action is both "neutral" and "generally applicable." Before 1990, the Supreme Court had subjected laws that burdened the free exercise of religion to strict scrutiny. Hence, the government had to narrowly tailor such laws to serve a compelling state interest. *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972);

*Sherbert v. Verner,* 374 U.S. 398, 403, 83 S.Ct. 1790, 1793–94, 10 L.Ed.2d 965 (1963).

The RFRA provides in pertinent part:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1.

## A. Substantial Burden on Free Exercise

■ Under *Yoder,* to which the RFRA expressly refers, the plaintiff must make two threshold showings to state a *prima facie* Free Exercise claim. *See Werner v. McCotter,* 49 F.3d 1476, 1479 (10th Cir.) (applying *Yoder* threshold test to RFRA claim), *cert. denied,* —— U.S. ——, 115 S.Ct. 2625, 132 L.Ed.2d 866 (1995). First, the governmental action must burden a religious belief, rather than a philosophy or a way of life. *Yoder,* 406 U.S. at 215–19, 92 S.Ct. at 1533–35; *Thomas v. Review Bd.,* 450 U.S. 707, 713–18, 101 S.Ct. 1425, 1429–32, 67 L.Ed.2d 624 (1981). Second, the plaintiff must sincerely hold the burdened belief. *Yoder,* 406 U.S. at 215–19, 92 S.Ct. at 1533–35; *Thomas,* 450 U.S. at 713–18, 101 S.Ct. at 1429–32.

The ODRC does not concede that Blanken sincerely holds his purported beliefs. Nonetheless, the ODRC does not explicitly address the sincerity issue in its summary judgment motion.[3]

Rather, ODRC concentrates on the first requirement of the *prima facie* showing from *Yoder,* to wit, that Blanken's views are a lifestyle choice rather than a religious belief.[4] Native American Spirituality does not *require* the growth of hair. ODRC contends that to place beliefs arising from individual experiences—here, Blanken's Vision Quest—under the purview of the RFRA would lead to "endless litigation and an inability to regulate employee conduct in the workplace." Def.Mot. at p. 15. ODRC also argues that its Policy does not substantially burden Blanken's exercise of religion because he has other avenues of religious exercise available to him. Def.Mot. at pp. 14–15. The Court will address these arguments *seriatim.*

"The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." *Hernandez v. C.I.R.,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2149, 104 L.Ed.2d 766 (1989).[5] Presumably, a burden on an incidental religious belief or practice which holds little significance to a particular religious structure, would not be "substantial." From this presumption comes the often-cited requirement that the belief or practice be central to the religion.[6]

■ The Court holds, however, that a religion need not mandate a religious expression to fall under the RFRA's protection. *See, e.g., Werner,* 49 F.3d at 1480 ("[G]overnment regulation must significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual beliefs."). The Court accordingly declines to adopt the Ninth Circuit's decision in *Bryant*

---

**3.** ODRC disputes the date on which Blanken began practicing Native American Spirituality, *see* Def.Mot. at pp. 8–9, but does not specifically contest the sincerity of Blanken's beliefs.

**4.** As Defendants bluntly assert in their response: "[T]here is no such religion as 'Native American.' " *See* Def.Resp. at 1.

**5.** 42 U.S.C. § 2000bb–2(4) defines "exercise of religion" by reference to First Amendment juris-

prudence, but does not attempt to codify any particular religious doctrine.

**6.** As ODRC does not contest that the growth of hair is a central tenet of Native American religion, the Court does not reach whether a RFRA challenge may be based on the substantial burden of a peripheral or non-central tenet. *See Muslim v. Frame,* 891 F.Supp. 226, 229–31 (E.D.Pa.1995) (upholding such a challenge).

*v. Gomez,* 46 F.3d 948, 949 (9th Cir.1995) (defining a substantial burden as one which prevents a person from "engaging in conduct or having a religious experience which the faith mandates.") (quoting *Graham v. C.I.R.,* 822 F.2d 844, 850–51 (9th Cir.1987)), as a proper measure of "substantial burden." While *Bryant*'s limitation may simplify application of the RFRA, it misstates general First Amendment precedent[7] and contradicts legislative history of the RFRA. *See Mack v. O'Leary,* 80 F.3d 1175, 1178–79 (7th Cir.1996) (Posner, C.J.) (adopting broader RFRA protection).

Congress purposefully omitted from the RFRA language requiring that the belief at issue be "religiously compelled." *See* Douglas Laycock & Oliver S. Thomas, *Interpreting the Religious Freedom Restoration Act,* 73 Tex.L.Rev. 209, 230–34 (1994) (reviewing RFRA's legislative history). The RFRA does not require religious compulsion, for to do so would "run the risk of excluding practices which are generally believed to be exercises of religion worthy of protection."[8] Consider, for example, the issues of regular attendance of worship services or Bible reading[9] in the various branches of the Christian faith. Adherents to Christianity have different opinions about the form and importance these matters. Under ODRC's approach, a state could burden such activities without a compelling interest.

Disallowing RFRA protection to such non-mandated activity would contravene the free exercise of religion. A state may not proscribe a religious activity with impunity, without a compelling justification, merely because the exercise of a religious practice is optional to the practitioner.

■ Furthermore, the Court finds the source of Blanken's inspiration to grow his hair irrelevant to the RFRA inquiry. Blanken arrived at this decision through a Vision Quest, another tenet of Native American Spirituality. So long as the motivation is religiously oriented, the Court will inquire no further. "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez,* 490 U.S. at 699, 109 S.Ct. at 2148. Whether one decides to follow a tenet of religion after a lifetime of exposure to well-established organized practice, or, like Blanken, decides to follow a religious tenet after receiving a vision,[10] the RFRA and the First Amendment protect the activity.[11]

■ The only remaining question is whether it is possible substantially to burden one tenet of religion when other practices of the religion remain available. ODRC argues

---

7. *See, e.g., Goldman v. Weinberger,* 475 U.S. 503, 506, 106 S.Ct. 1310, 1312, 89 L.Ed.2d 478 (1986) (holding that to forbid wearing a yarmulke imposes a substantial burden, without addressing Jewish mandate).

8. *Religious Freedom Restoration Act of 1991: Hearings on H.R. 2797 before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 102d Cong., 2d Sess. 1, 128 (1992) (letter from Rep. Stephen J. Solarz to Rep. Don Edwards).

9. The Bible pronounces its own significance—2 *Timothy* 3:16 ("All scripture is inspired by God" (NRSV))—but Christianity does not, strictly speaking, command individual believers to read the Bible daily. Indeed, until well after the advent of the movable type printing press in the fifteenth century, it was impractical if not impossible for most believers to engage in this practice. Yet, among contemporary Evangelical Christians, daily Bible reading has become a fundamental tenet of the Christian faith.

10. Paul, author of much of the Christian New Testament, purportedly became an Apostle through a sudden "vision" experience. *Acts* 9:1–9.

11. ODRC posits a "slippery-slope" argument. ODRC conjures a hypothetical RFRA plaintiff who has "a message that the white race is the superior race and that therefore he will not supervise black, hispanic or arab inmates ..." Def.Resp. at p. 3. This brand of logic does not persuade the Court. First, ODRC's argument misses the important step that the practice must be an "observation of a central religious belief or practice" *Hernandez,* 490 U.S. at 699, 109 S.Ct. at 2148. Furthermore, ODRC's argument overlooks the remainder of the RFRA analysis, that is, that compelling interests may justify *substantial* burdens on any such "purported" religious exercise. *See, e.g., Bob Jones Univ. v. United States,* 461 U.S. 574, 604, 103 S.Ct. 2017, 2035, 76 L.Ed.2d 157 (1983) (promoting racial equality in university funding is a compelling justification).

that because Blanken can take advantage of religious practices aside from the growth of his hair, such as vision quests, that the ODRC Policy is not a substantial burden. The Court also rejects this argument. ODRC's position arises from an assumption that all tenets of Native American Spirituality are alike or exchangeable. This is not borne out in the record, nor will the Court make such an assumption.

■ "Although Native American religion and its practices are not familiar to many, it is a bona fide religion. The practice of this religion has the same beneficial effect on its adherents as do other religions for their adherents." *Hamilton v. Schriro,* 863 F.Supp. 1019, 1022 (W.D.Mo.1994), *rev'd on other grounds,* 74 F.3d 1545 (8th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 193, —— L.Ed.2d —— (1996). Blanken has stated his personal belief that the growth of hair is a central tenet of his faith and Native American Spirituality in general. *See* Blanken Dep. at 47. ODRC offers nothing to the contrary aside from conclusory statements. Furthermore, other courts have recognized this belief, *see, e.g., Pollock v. Marshall,* 845 F.2d 656, 658–60 (6th Cir.), *cert. denied,* 488 U.S. 987, 109 S.Ct. 545, 102 L.Ed.2d 575 (1988); *Diaz v. Collins,* 872 F.Supp. 353, 355 (E.D.Tex.1994) ("traditional ways" of Native American worship included "the wearing of the long hair, which is to be cut only in times of sorrow or grief"). Indeed, the relationship between hair and religious conviction cannot seriously be contested.[12]

■ The Court therefore finds that Blanken has presented a *prima facie* showing under the RFRA that he sincerely holds a religious belief that a law of general application has substantially burdened.

### B. Compelling Interest

Having found that the ODRC Policy substantially burdens Blanken's religious expression, the burden now shifts to defendants, who must prove that the burden they have imposed furthers a compelling state interest. *See* 42 U.S.C. § 2000bb–1(b)(1). ODRC identifies three primary interests advanced by its Policy: safety, discipline, and *esprit de corps.*

■ In enacting the RFRA, Congress did not define "compelling interest," *see* 42 U.S.C. § 2000bb(a)(5), but made reference to existing caselaw before *Employment Div., Dept. of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). "Compelling" does not mean merely a "reasonable means of promoting a legitimate public interest." *Hobbie v. Unemployment Appeals Comm'n,* 480 U.S. 136, 141, 107 S.Ct. 1046, 1047, 94 L.Ed.2d 190 (1987). To be compelling, the interest must be of the "highest order." *Yoder,* 406 U.S. at 215, 92 S.Ct. at 1533.

■ In decisions before *Smith,* the Supreme Court recognized the need to defer to prison administrators. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979) (recognizing that courts have "accorded wide-ranging deference [to prison administrators] in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."); *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) ("[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform ... Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.").

This deference is also borne out in the legislative history to the RFRA. Congress expected the courts to give due deference to prison administrators "in establishing necessary regulations and procedures to maintain good order, security, and discipline," but warned against speculation or "post-hoc rationalizations." *Senate Comm. on the Judi-*

---

12. The Old Testament describes the Nazirite vow in *Numbers* 6:1–21, and includes:

> All the days of their nazirite vow no razor shall come upon the head; until the time is completed for which they separate themselves

to the LORD, they shall be holy; they shall let the locks of the head grow long.

*Numbers* 5:5 (NRSV). *See also Judges* 16:17–18 (Samson); *Acts* 18:18 (Apostle Paul).

*ciary, Religious Freedom Restoration Act of 1993*, S.Rep. No. 111, 103d Cong., 1st Sess. 10 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1903.

In support of these interests, ODRC has included the affidavits of several ODRC administrators both past and present. ODRC notes that over 150 prisons in the United States and Canada have similar grooming policies, *see* Dallman Aff. ¶¶ 1, 5 (Att. as Def.Ex. 7), and that the need for such policies arises from ever increasing prison overpopulation. *Id.* at ¶ 3.

William Dallman, a former warden of Ohio's correctional facility at Lebanon, Ohio, attests to the reasons behind requiring uniforms for prison guards who directly supervise inmates.

> To protect the legitimate authority of prison staff and to physically protect them and others while employees in the modern correctional environment are surrounded and outnumbered, certain management tools have evolved based upon the experience of professionals in our field. Uniforms are employed to highlight and broadcast the solidarity, discipline, unity, and similarity of uniformed prison employees. One employee supervising prisoners is not just one, but a representative of a team. The uniform minimizes individual differences and individual needs. Uniforms help define and separate the identities and orientations of employees and inmates. It is vital that those who directly supervise prisoners do not appear to identify with any aspects of prison culture. To do so compromises effectiveness as a supervisor. Uniform personnel who choose not to conform with conventional uniform and grooming practices are quickly perceived as partners in rebellion and simultaneously ignored as authority figures. Prisoners typically look for and target em-

ployees who are perceived as non-conforming. To permit employees to personalize their uniforms or grooming destroys the value and purpose of a uniform and standardized appearance.

Dallman Aff. at ¶ 6.

Blanken's own experiences have confirmed ODRC's concern for uniformity. Although Blanken's employment appraisals have been satisfactory or better at every review, *see* Blanken Aff. at ¶ 1, at least one supervising officer has confused Blanken with an inmate because of his appearance. Sergeant Willie Wilson, Jr., the Safety/Sanitation Officer at OCI, attests that he corrected an individual whom he believed to be an inmate in part because of his hair length. *See* Wilson Aff. at ¶¶ 1–4 (Att. as Def.Ex. 10).

■■■ As the Eighth Circuit has stated in upholding similar concerns as compelling in the RFRA context: "Prison safety and security are penological concerns of the highest order." *Hamilton v. Schriro*, 74 F.3d 1545, 1554 (8th Cir.), *cert. denied,* — U.S. —, 117 S.Ct. 193, — L.Ed.2d — (1996); *see also Lawson v. Singletary*, 85 F.3d 502 (11th Cir.1996) (holding similarly). Although the subject regulation concerns a prison employee rather then an inmate, the Court finds these circumstances implicate the same interests in prison security.[13] The Court finds that, as a matter of law, ODRC's concerns for safety and discipline within its corps of prison officers are compelling.

### C. Narrowly Tailored Burden

■■■ The Court must next examine whether the Policy satisfies the RFRA's requirement that it be "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(b)(2). ODRC bears the burden of proof on this issue. 42 U.S.C. § 2000bb–1(b); *Hamilton*, 74 F.3d at 1552. Although ODRC bears

---

**13.** Although the interests are not identical, they are of the same magnitude in the prison setting. For example, in prisoner hair length cases, prison officials express security concerns about the possibility that inmates will use their long hair to hide contraband. *See Hamilton*, 74 F.3d at 1548, 1554–55. Prison officials presumably would not have the same apprehension about an employee's hair, at least not to the same degree.

In the instant case, ODRC justifies its hair length regulation on the basis of uniformity among the employees. It expressly disavows any reliance on safety concerns such as contraband or that longer hair presents a threat because it would be easier for prisoners to grab.

the burden of proof, as with the compelling interest test, the Court must afford the ODRC due deference on matters touching upon prison security. *Id.* at 1554 (citing RFRA legislative history, *Senate Comm. on the Judiciary, Religious Freedom Restoration Act of 1993,* S.Rep. No. 111, 103d Cong., 1st Sess. 10 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1899–1900).[14] This does not mean, however, that ODRC can meet its burden by "conclusory statements and post hoc rationalizations for their conduct." *Id.* at 1554 n. 10.

Several courts have concluded that hair length policies represent the least restrictive means to achieve the goal of security. *See, e.g., Hamilton,* 74 F.3d at 1555 n. 12; *Abordo v. Hawaii,* 938 F.Supp. 656, 661–62 (D.Hawai'i 1996); *Phipps v. Parker,* 879 F.Supp. 734, 736 (W.D.Ky.1995); *Diaz v. Collins,* 872 F.Supp. 353, 359 (E.D.Tex.1994). These decisions accepted testimony of prison officials that a less restrictive alternative would not satisfy the interests of safety. On a common sense level, inmates can hide contraband in their hair, and searching long hair would be more difficult and time consuming than searching short hair. Although prison officials could arguably accommodate long hair by taking more time and conducting more searches, such additional searches "would be impractical and just as likely to burden constitutional interests." *Phipps,* 879 F.Supp. at 736.

 Defendants offer the following in support of their assertion that the Policy represents the least restrictive means to further its compelling interest in uniformity:

I found no practical way of deciding among uniformed staff's individual desires during my twenty-two years as a warden, while still preserving the objectives of grooming and uniform standards. The difficulties of evaluating and accommodating individual assertions while maintaining the integrity of the policy proved impossible through exemptions. The most effective and fair means of applying prison regulations is across the board to avoid resent-

ment among the staff. To permit personalization based upon alleged religious or cultural needs will introduce chaos into the system and creates an impossible management situation. A manager does not have the wisdom to determine if a professed religious belief is valid. Therefore, any employee could do as they choose justifying their choices via their own personal religious or cultural notions, as differentiating between the two is sometimes very difficult.

It has been my experience in circumstances requiring disciplined group activities that uniformed dress and appearance have more than proved its value. It has also been my experience that permitting uniformed prison employees to personalize their appearance negatively affects the control system of a prison and causes other chaotic problems for management. As a warden I learned immediately of staff who attempted to circumvent the dress code from other staff and inmates, demonstrating to me that such deviations are immediately noticed and commented about within an institution. I experienced instances when staff would try to circumvent Lebanon and later ODRC policy by tucking hair into their hats or covering wearing earrings by placing a band-aid over their ear. Inmates would report such instances with glee and indicate that I was "slipping" when staff tried to disguise noncompliance, indicating to me that allowing deviations from the standard undermined my and my staff's authority with prisoners. Thus, it is my opinion that there is no room for exceptions for uniformed personnel who supervise inmates in prison settings.

Dallman Aff. at ¶ 8–9. Dallman's affidavit shows that the Policy does not concern some remote, abstract principle. In the day to day struggle to maintain order and discipline in prison, matters such as how prison employees dress, and whether they conform to policies, have a real impact.

Plaintiff presents several arguments in support of his contention that the Policy does

---

**14.** Again, although this case involves a prison employee rather than an inmate, the issue of prison security is clearly implicated and the Court must, in these circumstances, apply a deferential standard to the Policy.

not represent the least restrictive means to achieve the goal of safety. First, plaintiff notes that the Policy allows female employees to wear their hair long. The Court is aware of at least one decision in a factually similar case in which the court found the same argument persuasive. *See Rourke v. N.Y. State Dept. of Correctional Serv.*, 915 F.Supp. 525, 543 (N.D.N.Y.1995). In *Rourke*, however, the court did not engage in any analysis of the issue apparently because the state failed to brief it. *Rourke* is not persuasive on this difficult issue.

In the 1960s, our country experienced a cultural revolution led largely by young college-aged people. One of the symbols of that revolution was that young men began to wear their hair long. For some, it was an intentional sign of rebellion against society and authority, in which shorter hair for men had been the norm for many decades. *See Ham v. South Carolina*, 409 U.S. 524, 529–30, 93 S.Ct. 848, 851–52, 35 L.Ed.2d 46 (1973) (Douglas, J., concurring in part and dissenting in part). It may also have been, to some extent, a contrast to military-style short hair during the Vietnam War. For most young men, however, it was probably only a fashion trend they followed to gain acceptance among their peers. It is noteworthy that throughout this period, although women's hair styles have changed, most segments of society have accepted long hair for women, and have never viewed it as a sign of rebellion. Today, the issue of men's hair length is probably less politically charged, but some of the same nonconformist connotations and perceptions remain.

Among military personnel, short hair for men remains the standard throughout most of the world.[15] Defendants desire to have their prison employees function almost like a military unit within the prison system. They want prison employees to project the image of a monolithic, highly disciplined force. It is not for this Court to second-guess the wisdom of prison officials in selecting this approach. Indeed, given the volatile and life threatening conditions they must deal with on a daily basis, the overall policy is well justified.[16] Although they do not spell them out in detail, defendants rely directly on these societal perceptions of hair length in explaining the distinction they have made between male and female employees in formulating their Policy.[17] Def.Memo. in Opp. (Doc. 16) at 5.

Plaintiff suggests that the Policy's distinction between male and female guards is akin to racism. *See* Pl.Memo. contra (Doc. 17) at 17 n. 6. The Court must reject this argument. Not all discrimination is invidious. Our society, as well as established constitutional jurisprudence, accepts different treatment of men and women in a variety of circumstances. *See Caban v. Mohammed*, 441 U.S. 380, 398, 99 S.Ct. 1760, 1771, 60 L.Ed.2d 297 (1979) (dissenting opinion by Stewart, J.); *Fagan v. National Cash Register Co.*, 481 F.2d 1115 (D.C.Cir.1973) (private business's different hair length policies for men and women not indicative of sex-based discrimination); *Gadberry v. Schlesinger*, 419 F.Supp. 949 (E.D.Va.1976), *aff'd*, 562 F.2d 46 (4th Cir.1977) (differences in grooming codes between men and women did not detract from Air Force's goals of achieving military image, discipline, and esprit de corps). Hence, the Policy permissibly forbids male employees from wearing makeup or colored nail polish.

The Court finds that the mere fact that the Policy prescribes a different standard for female prison employees does not prevent the policy from being the least restrictive

---

**15.** *See, e.g.,* Marine Corps Orders 1020.24(I), 10120.34.

**16.** Witness the much too memorable tragedy of the riot, hostage crisis, and murders that occurred at Ohio's Lucasville prison.

**17.** Of course, these perceptions are not simply those of ODRC. The Court is not saying that it is proper for ODRC to pin its Policy on its own cultural biases. Rather, ODRC is entitled to recognize that cultural stereotypes and perceptions have significance among the prisoners, who, as Dallman's affidavit shows, understand the link between the appearance of prison employees and authority. In fact, these matters appear to have an exaggerated importance to prisoners that those outside the prison setting may have difficulty understanding or believing. *See* Dallman Aff. at ¶ 9.

means to achieve the compelling interest in safety furthered by uniformity.

Plaintiff also argues that defendants could achieve the goal of uniformity by having plaintiff tuck his hair into his collar or tuck it up under his cap as the female prison employees do. In support of this argument, plaintiff provides photographs of himself using these alternatives. Plaintiff's characterization of these suggested accommodations is telling: "The pictures ... demonstrate that, when tucked into his collar or pulled under his cap, the Plaintiff's hair is *practically* invisible to anyone looking at him." Pl.Memo. contra (Doc. 17) at 18 (emphasis added).

In fact, in both pictures, plaintiff's long hair, and the patch from which it grows, are readily visible. Indeed, with all due respect to plaintiff and his religious beliefs, plaintiff's hair creates a very unusual appearance. Plaintiff's long hair grows from a very conspicuous patch at the base of his neck. The patch of hair, about two inches in diameter, appears much darker than the short cut hair surrounding it because plaintiff's light skin shows through the short hair, but not the patch. As a result the patch of hair from which plaintiff's long hair grows stands out clearly. The long thin "tail" of plaintiff's hair is likewise extraordinary in appearance, and visible, whether or not it is tucked under a cap or in plaintiff's collar. In this respect, plaintiff's appearance is more unusual by comparison to the Policy standards than if he had simply allowed all of his hair to grow evenly long one-half inch below the collar, for example. In short, plaintiff's long hair does not, by any stretch of the imagination, come close to meeting the uniform, clean cut, military-style look defendants are legitimately trying to achieve among prison employees.

In virtually any other context, attention to such matters would betray an almost paranoid bias based on cultural stereotypes concerning long hair on men. In the prison setting, however, these issues take on a significance that most in the outside world cannot fully appreciate. This is precisely why the U.S. Supreme Court, and Congress in the legislative history of the RFRA, recognize that the unique prison context is a factor that Courts must consider when addressing prison regulations. Prison officials, through their special education and experience in the prison system, have professional insight into these matters that is due considerable deference. The Court finds that plaintiff's suggested alternatives do not, as a matter of law, conform to defendants' compelling interest in uniformity.

Plaintiff further asserts that, if defendants truly desired uniformity, they would end all variance in appearance. For example, defendants' Policy allows male employees to have an evenly-trimmed beard or mustache.

The Court finds plaintiff's argument unpersuasive. The argument is, in essence, a variation of the argument that the Policy allows female employees to have longer hair. Given the deference due the prison officials who created the Policy, the Court finds that allowance for some variation does not destroy the goal of uniformity. ODRC determined that certain variations do not detract from its goal. The allowance of facial hair is a good example. The Policy provides in part: "Facial hair must be neatly and evenly trimmed." Given the deference due the ODRC's decision making, the Court cannot say that a neatly and evenly trimmed beard is inconsistent with the Policy's goal of uniformity.

Lastly, plaintiff suggests that defendants could achieve their goal by educating the prison population about Native Americans and their beliefs. The Court cannot properly force defendants to experiment with sensitivity training in the prison setting. Certainly, teaching people to accept one another and ideas that may be foreign to them is a laudable goal in most circumstances. In the prison context, however, plaintiff's suggestion could easily backfire. Many prisoners and prison employees might resent the special treatment such an educational program would afford plaintiff's beliefs. Moreover, plaintiff's suggestion would put defendants in the difficult business of teaching comparative religion, which might itself lead to even more difficult First Amendment issues.[18]

---

18. Presumably, to be fair, defendants would have to provide such sensitivity training about numer- ous other religions.

In sum, the Court finds that plaintiff's legal arguments do not detract from defendant's well supported assertion that their Policy represents the least restrictive means of furthering their compelling interest in uniformity among prison employees' appearance.

Based on the above, the Court holds as a matter of law that defendants have established that their interest in uniformity among prison employees' appearance is compelling, and that the Policy is the least restrictive means to further that goal.

### IV.

The standard under which plaintiff's First Amendment claims are examined presents an even higher hurdle for plaintiff. It follows that, if plaintiff's RFRA claim fails as a matter of law, then defendants are also entitled to summary judgment in their favor on plaintiff's First Amendment claim.

### V.

For the above reasons, the Court **GRANTS** defendants' motion for summary judgment (Doc. 14) and **DENIES** plaintiff's motion for summary judgment (Doc. 9).

The Clerk shall enter a final judgment in favor of defendants and against plaintiff dismissing plaintiff's claims with prejudice.

The Clerk shall remove this case from the Court's pending cases and motions lists.

The parties shall bear their own costs.

**IT IS SO ORDERED.**