**[This opinion has been published in *Ohio Official Reports* at 89 Ohio St.3d 62.]**

**HUMPHREY, APPELLANT, *v*. LANE ET AL., APPELLEES.**

**[Cite as *Humphrey v. Lane*, 2000-Ohio-435.]**

*Civil rights—Standard under Section 7, Article I of the Ohio Constitution for reviewing a generally applicable religion-neutral state regulation that allegedly violates a person's right to free exercise of religion—Hair length of Native American corrections officer—Least restrictive means of furthering state's compelling interest not shown.*

Under Section 7, Article I of the Ohio Constitution, the standard for reviewing a generally applicable, religion-neutral state regulation that allegedly violates a person's right to free exercise of religion is whether the regulation serves a compelling state interest and is the least restrictive means of furthering that interest.

(No. 99-206—Submitted October 13, 1999 at the Pickaway County Session—Decided May 24, 2000.)

APPEAL from the Court of Appeals for Hocking County, No. 98-CA-004.

———————————

{¶ 1} This case involves a clash between appellant Wendall Humphrey's sincerely held religious beliefs, which include a belief in maintaining long hair, and the grooming policy of his employer, the Ohio Department of Rehabilitation and Correction ("ODRC"). This conflict commenced when appellee Janis Lane, Warden of the Hocking Correctional Facility, notified Humphrey that he would be terminated from his position as a corrections officer because he refused to cut his hair to collar length, as required by the ODRC grooming policy.

{¶ 2} Humphrey is a Native American and wears his hair long as a part of his practice of Native American Spirituality. Humphrey was born on a reservation but was adopted by a Christian family and raised as a Christian. After he became

an adult, Humphrey's adopted parents told him that he had parents and siblings living on an Indian reservation. Humphrey came to embrace his Native American heritage, enrolling as a member of the Shoshone-Bannock Tribe and studying Native American beliefs and practices. Humphrey has practiced the religious customs of Native American Spirituality since 1990.

{¶ 3} As part of his religious practice, Humphrey began growing his hair long in 1990. Humphrey believes that as a part of walking the "red road," the sacred Native American path of spirituality, he must keep his hair long. Humphrey believes that a man's hair is a part of his spiritual essence and should be cut only on certain occasions, such as when he is in mourning.

{¶ 4} Humphrey has been employed at Hocking Correctional Facility ("Hocking") since 1988. ODRC first issued the grooming policy relevant in this case in 1992. The relevant portion, virtually unchanged since then, now reads:

"IV. Policy:

"It is the policy of the Department of Rehabilitation and Correction that employees of the Department present a professional and dignified image, commensurate with their responsibilities, in order to instill confidence on the part of the public and establish respect from those under the supervision of the department.

"V. Procedures:

"A. Uniformed Personnel

" * * *

"2. Hairstyle shall not interfere with the wearing or proper positioning of the uniform cap. Hair shall be styled above the eyebrow in the front. Certain hairstyles may be considered incompatible with a professional and dignified appearance.

"a. Male employees' hair shall be evenly cut and neatly groomed. Hair must be cut in such a style that it does not cover the entire ears on the side and is collar length or shorter in the back.

" * * *

"c. Female employees [*sic*] hair may not be worn below the shoulders and must be off the collar when wearing the uniform cap. Female employees with hair longer than shoulder length may pull it back, pin it up, etc., to achieve this."

{¶ 5} ODRC does not contend that the grooming policy is necessary as a safety or security measure. As the policy itself states, it exists so that employees will project "a professional and dignified image, * * * in order to instill confidence on the part of the public and establish respect from the inmates." ODRC Director Reginald Wilkinson testified regarding the importance of the policy:

"[The grooming policy] is essential to the *esprit de corps*, image, discipline and security at these institutions. The purpose of the policy is to create a unified appearance among uniformed personnel, which personnel directly supervis[e] and interac[t] with the inmate population. A uniform, professional image is essential to projecting an image of monolithic, indivisible authority to inmates from the uniformed prison staff."

{¶ 6} Despite the goal of indivisible authority, the grooming policy differs for uniformed personnel, nonuniformed personnel, and noninstitutional personnel, and for men and women. Only male uniformed employees are required to cut their hair "in such a style that it * * * is collar length or shorter in the back."

{¶ 7} Humphrey was opposed to the grooming policy from the outset in 1992. When informed that he would have to cut his hair in order to remain at the Hocking Correctional Facility, he filed a charge of discrimination with the Ohio Civil Rights Commission in June 1992. In resolution of that charge, Humphrey agreed to wear his hair underneath his uniform cap while on duty. He has continued to wear his hair in that manner while on duty.

**{¶ 8}** There is no evidence that Humphrey's hairstyle has interfered with his ability to properly perform his job as a corrections officer. There is no evidence that the inmates disrespected Humphrey or that his hair adversely affected esprit de corps. At no time has a prison official told Humphrey that his hair length is a source of disruption for coworkers or inmates at Hocking. ODRC admits that there has never been a problem with Humphrey's job performance.

**{¶ 9}** On January 14, 1997, Lane issued a memorandum to all staff at Hocking, reminding them of the grooming policy and requiring compliance by January 30, 1997. Lane sent the memorandum on the heels of a finding by the United States District Court for the Southern District of Ohio that the ODRC policy did not violate the religious freedom of the particular plaintiff in *Blanken v. Ohio Dept. of Rehab. & Corr.* (1996), 944 F.Supp. 1359. That case was decided in large part because the plaintiff's hairstyle was so extreme that it could not be hidden under a uniform cap. Lane wrote in the memorandum that the court "determined that ODRC's interest in maintaining security and discipline in the institution is a compelling interest which justifies requirements to maintain hair lengths."

**{¶ 10}** Humphrey did not cut his hair, and thus became subject to the disciplinary process, including oral and written reprimands. He was scheduled for a predisciplinary conference, the notice for which advised Humphrey that he was subject to further disciplinary action, including termination of employment. The conference was scheduled for March 14, 1997, but was never held because Humphrey was on medical leave at the time.

**{¶ 11}** On May 28, 1997, Humphrey filed a complaint for declaratory judgment and injunctive relief and a motion for a preliminary injunction in the Hocking County Court of Common Pleas. After a June 6, 1997 hearing, the trial court granted Humphrey's motion for preliminary injunction on June 11, 1997. A trial on the merits was held on August 28, 1997. On February 6, 1998, the trial court granted judgment in Humphrey's favor.

**{¶ 12}** In arriving at its decision, the trial court employed the constitutional analysis set forth by this court in *In re Milton* (1987), 29 Ohio St.3d 20, 29 OBR 373, 505 N.E.2d 255, and *State v. Whisner* (1976), 47 Ohio St.2d 181, 1 O.O.3d 105, 351 N.E.2d 750. Under those decisions, the state cannot infringe on a sincerely held religious belief unless it shows a compelling state interest and also shows that the interest was furthered by the least restrictive means available. The court made factual determinations that Humphrey's religious beliefs were sincerely held and that the aims of the grooming policy could be achieved by Humphrey simply tucking his hair beneath his uniform cap. The trial court found that the ODRC did not employ the least restrictive means to further the compelling state interest at issue.

**{¶ 13}** The court of appeals reversed the trial court. The appellate court held that the trial court had applied the wrong constitutional standard to the policy at issue. The court of appeals stated that the ODRC did not need to show a compelling state interest. Instead, the court found the standard enunciated by the United States Supreme Court in *Oregon Dept. of Human Resources, Emp. Div. v. Smith* (1990), 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876, to be applicable. In *Smith*, the court held that generally applicable, religion-neutral laws that have an incidental effect of burdening religious practice need not be justified by a compelling state interest. Applying the *Smith* standard, the court of appeals found that the grooming policy was generally applicable and religion-neutral, and thus did not violate the United States and Ohio Constitutions.

**{¶ 14}** Further, the appellate court held that even if the compelling-state-interest test applied, the ODRC's compelling state interest outweighed the burden placed upon Humphrey's religious practices and that the grooming policy was the least restrictive means of furthering its compelling interests.

**{¶ 15}** This cause is now before the court upon the allowance of a discretionary appeal.

_____

*Porter, Wright, Morris & Arthur, Kathleen M. Trafford* and *Constance M. Greaney*, for appellant.

*Betty D. Montgomery*, Attorney General, *Mary Beth Foley*, Assistant Attorney General, *Edward B. Foley, pro hac vice*, State Solicitor, and *David M. Gormley*, Associate Solicitor, for appellees.

*Carrie M. Cassady* and *Linda K. Fiely*, urging reversal for *amicus curiae*, Ohio Civil Service Employees Association, AFSCME Local 11, AFL-CIO.

*Kevin J. Hasson, Eric W. Treene* and *Roman P. Storzer, pro hac vice*, urging reversal for *amicus curiae,* Becket Fund for Religious Liberty.

_____

**PFEIFER, J.**

{¶ 16} We hold that under Section 7, Article I of the Ohio Constitution, the standard for reviewing a generally applicable, religion-neutral state regulation that allegedly violates a person's right to free exercise of religion is whether the regulation serves a compelling state interest and is the least restrictive means of furthering that interest. We further hold that the grooming policy in this case, while in furtherance of a compelling state interest, did not employ the least restrictive means of furthering that interest.

{¶ 17} The First Amendment to the United States Constitution states:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

{¶ 18} The Ohio Constitution contains a section devoted entirely to the freedom of religion, which it describes in detail:

"All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience. No person shall be compelled to

attend, erect, or support any place of worship, or maintain any place of worship, against his consent; and no preference shall be given, by law, to any religious society; nor shall any interference with the rights of conscience be permitted. No religious test shall be required, as a qualification for office, nor shall any person be incompetent to be a witness on account of his religious belief; but nothing herein shall be construed to dispense with oaths and affirmations. Religion, morality, and knowledge, however, being essential to good government, it shall be the duty of the general assembly to pass suitable laws to protect every religious denomination in the peaceable enjoyment of its own mode of public worship, and to encourage schools and the means of instruction." Section 7, Article I.

{¶ 19} Verbiage does not indicate commitment to an ideal. The one phrase in the United States Constitution regarding the freedom of religion is one of the most powerful statements in human history. Ohio's more detailed description of the right does not by itself prove that Ohio's framers created a broader freedom of religion than exists in the United States Constitution. However, the words of the Ohio framers do indicate their intent to make an independent statement on the meaning and extent of the freedom. Whether that statement creates a relevant difference is the question we face today.

{¶ 20} In employing our comparison we are not doing a mere word count, but instead are looking for a qualitative difference. The Ohio Constitution does have an eleven-word phrase that distinguishes itself from the United States Constitution: "nor shall any interference with the rights of conscience be permitted." The United States Constitution states that Congress shall make no law "prohibiting the free exercise [of religion]." We find the phrase that brooks no "interference with the rights of conscience" to be broader than that which proscribes any law prohibiting free exercise of religion. The Ohio Constitution allows no law that even *interferes* with the rights of conscience. The federal Constitution concerns itself with laws that *prohibit* the free exercise of religion. By its nature

the federal Constitution seems to target laws that specifically address the exercise of religion, *i.e.*, not those laws that tangentially affect religion. Ohio's ban on any interference makes even those tangential effects potentially unconstitutional.

{¶ 21} The United States Supreme Court's interpretation of the federal Constitution makes it clear that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " *Smith*, 494 U.S. at 879, 110 S.Ct. at 1600, 108 L.Ed.2d at 886, quoting *United States v. Lee* (1982), 455 U.S. 252, 263, 102 S.Ct. 1051, 1058, 71 L.Ed.2d 127, 136, fn. 3 (Stevens, J., concurring). Under the standard enunciated by the court in *Smith*, the relevant issues are whether the regulation at issue is religion-neutral and whether it is generally applicable. If those elements are fulfilled, then the regulation does not violate the Free Exercise Clause.

{¶ 22} It was the *Smith* decision that marked the divergence of federal and Ohio protection of religious freedom. Not until *Smith* did the difference in the constitutional clauses become relevant. This court has traditionally mirrored federal jurisprudence as to protection of religious freedom. In *State v. Whisner* (1976), 47 Ohio St.2d 181, 217-218, 1 O.O.3d 105, 124-125, 351 N.E.2d 750, 771, this court followed federal jurisprudence in enunciating a compelling-state-interest test in Ohio. Citing *Wisconsin v. Yoder* (1972), 406 U.S. 205, 233, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15, 35, this court held:

"What is required is a finding 'that there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause.' *Id*., at page 214 [92 S.Ct. at 1532, 32 L.Ed.2d at 24]. Moreover, even if the state can establish the requisite degree of interest, it must yet demonstrate that such interests cannot otherwise be served in order to overbalance legitimate claims to the free exercise of religion." (Footnote omitted.)

**{¶ 23}** The *Smith* decision made it clear that earlier federal jurisprudence on free exercise claims should not be relied upon when contemplating religion-neutral, generally applicable laws. However, we have made it clear that this court is not bound by federal court interpretations of the federal Constitution in interpreting our own Constitution. As this court held in *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 616 N.E.2d 163, paragraph one of the syllabus:

"The Ohio Constitution is a document of independent force. In the areas of individual rights and civil liberties, the United States Constitution, where applicable to the states, provides a floor below which state court decisions may not fall. As long as state courts provide at least as much protection as the United States Supreme Court has provided in its interpretation of the federal Bill of Rights, state courts are unrestricted in according greater civil liberties and protections to individuals and groups."

**{¶ 24}** We have considered the difference between the Ohio and federal Constitutions in regard to the Establishment Clause. As this court has previously stated, "[t]here is no reason to conclude that the Religion Clauses of the Ohio Constitution are coextensive with those in the United States Constitution, though they have at times been discussed in tandem. * * * The language in the Ohio provisions is quite different from the federal language. * * * We reserve the right to adopt a different constitutional standard pursuant to the Ohio Constitution, whether because the federal constitutional standard changes or for any other relevant reason." *Simmons-Harris v. Goff* (1999), 86 Ohio St.3d 1, 10, 711 N.E.2d 203, 211-212.

**{¶ 25}** As stated above, the Ohio Constitution's free exercise protection is broader, and we therefore vary from the federal test for religiously neutral, evenly applied government actions. We apply a different standard to a different constitutional protection. We adhere to the standard long held in Ohio regarding free exercise claims—that the state enactment must serve a compelling state interest

and must be the least restrictive means of furthering that interest. That protection applies to direct and indirect encroachments upon religious freedom.

{¶ 26} Before we analyze the state action in any case, we must first look at the beliefs of the person affected by the state action, and how those beliefs are affected by the state action. To state a prima facie free exercise claim, the plaintiff must show that his religious beliefs are truly held and that the governmental enactment has a coercive affect against him in the practice of his religion. *Whisner*, 47 Ohio St.2d at 200, 1 O.O.3d at 115-116, 351 N.E.2d at 762. There seems to be no dispute that Humphrey has successfully made those showings in this case. The trial court made express factual findings that Humphrey's religious beliefs are sincerely held. The state does not dispute that a central tenet of Native American Spirituality is that a man's hair should not be cut unless he is in mourning. Forcing Humphrey to cut his hair would certainly infringe upon the free exercise of his religion.

{¶ 27} Since Humphrey has made his prima facie case, the burden shifts to the state to prove that the regulation furthers a compelling state interest. Once that aspect has been satisfied, the state must prove that its regulation is the least restrictive means available of furthering that state interest.

{¶ 28} We are satisfied that the state does have a compelling interest in establishing a uniform and grooming policy for its guards. Maintenance of a prison system is a central role of government, an area it is uniquely suited for. It is an undertaking essential to justice and to the safety of the citizenry, but by its nature is fraught with danger and thus must be tightly controlled. A prison is a dangerous, potentially explosive environment.

{¶ 29} ODRC Director Reginald Wilkinson testified that a grooming policy "is essential to the *esprit de corps*, image, discipline and security at these institutions. The purpose of the policy is to create a unified appearance among uniformed personnel, which personnel directly supervis[e] and interac[t] with the

inmate population. A uniform, professional image is essential to projecting an image of monolithic, indivisible authority to inmates from the uniformed prison staff."

**{¶ 30}** The appearance of an organized, disciplined front could aid in squelching thoughts of organized unrest by prisoners. Prisons by their nature are filled with people who have rejected the structure of civilized society, and a heightened sense of order is necessary to maintain stability. Also, courts have provided prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish* (1979), 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447, 474.

**{¶ 31}** The state has sufficiently established that there is a compelling state interest in establishing uniform and grooming policies for prison workers. The state must further prove, however, that the policy is the least restrictive means of furthering that interest.

**{¶ 32}** The ODRC states the purpose of the policy within the policy language: "It is the policy of the Department of Rehabilitation and Correction that the employees of the Department present a professional and dignified image, commensurate with their responsibilities, in order to instill confidence on the part of the public and establish respect from those under the supervision of the department." The question is whether the ODRC adopted the least restrictive means of reaching that goal.

**{¶ 33}** We view the resolution of that issue to be a factual determination. The trial court found as a factual matter that the simple accommodation of allowing Humphrey to wear his hair pinned under his uniform cap was a less restrictive means of furthering ODRC's interest. The trial court saw Humphrey with his hair tucked beneath his cap and found that Humphrey presented the "professional and dignified image" required by the policy. The trial court found that "[i]t is

impossible to tell that his hair is longer than 1 or 2 inches when worn in this fashion. It does not appear ragged, unkempt or extreme."

{¶ 34} The trial judge also considered testimony concerning whether Humphrey's hair affected the attitudes of fellow guards, administrators, and inmates toward him, and viewed with his own eyes whether the accommodation was a practical one. The trial court found that a practical accommodation could be made. We defer to the trial court's factual finding.

{¶ 35} In *Blanken v. Ohio Dept. of Rehab. & Corr.* (1996), 944 F.Supp. 1359, the federal case that provided ODRC with a judicial imprimatur to enforce its grooming policy, the trial judge made a contrary finding regarding the least restrictive means test. In *Blanken*, the plaintiff also practiced Native American Spirituality. Included in his religious practices was a belief that he should not cut the hairs that grew at the base of his neck. Blanken believed that human hair can pick up the messages of spirits in the wind, and stated, "because the hairs at the base of the neck are rooted directly to the spinal column, I believe and it is believed that these hairs provide a direct link between the spirits in the wind and the human brain." *Id*. at 1362.

{¶ 36} The trial judge in *Blanken* determination that "plaintiff's hair creates a very unusual appearance. Plaintiff's long hair grows from a very conspicuous patch at the base of his neck. * * * The long thin 'tail' of plaintiff's hair is likewise extraordinary in appearance, and visible, whether or not it is tucked under a cap or in plaintiff's collar." *Id*. at 1370.

{¶ 37} In *Blanken*, the judge determined that no accommodation could be made because of the extraordinary look of the plaintiff's hair. The trial judge here came to a different conclusion based upon a different set of facts operative in this case. In *Blanken*, the goal of uniformity of appearance could not be achieved by a simple accommodation. In this case, it can.

**{¶ 38}** We view the two cases not as being at odds, but rather as complementary. The ODRC grooming policy should include an accommodation for persons who grow their hair long for religious reasons, allowing them to tuck their hair under their uniform caps. ODRC could discipline employees who, even after employing that accommodation, could not achieve the uniform "professional and dignified" image the policy requires.

**{¶ 39}** According to testimony at the trial, ODRC offered that accommodation beginning in 1992. Employees seeking an exemption to the hair length policy signed an affidavit saying they were doing so for religious reasons. Of the ten thousand to twelve thousand employees the ODRC employed in 1992, only sixteen sought the exemption.

**{¶ 40}** Therefore, we hold that the ODRC can further its compelling interest of a uniform grooming policy through a less restrictive means than the policy it currently employs. We accordingly reverse the judgment of the court of appeals and reinstate the trial court's declaratory judgment and injunction.

*Judgment reversed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

COOK, J., dissents.

————————————

**COOK, J., dissenting.**

**{¶ 41}** Certainly the Ohio Constitution is a document of independent force, and it *may* accord greater civil liberties and protections to our citizens than the federal Constitution requires. *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 616 N.E.2d 163, paragraph one of the syllabus. But the essential question in this case is whether the Ohio Constitution *requires* courts to subject a generally applicable law to the most rigorous judicial scrutiny when a plaintiff claims that the law incidentally burdens his or her religious beliefs or practices. I do not join the

majority today, because I conclude that our Constitution's independent recognition of "rights of conscience" does not justify rejecting the reasoning of the United States Supreme Court in *Oregon Dept. of Human Resources, Emp. Div. v. Smith* (1990), 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876.

{¶ 42} In *Smith*, the Supreme Court recognized the general principle that " '[c]onscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities.' " *Smith, supra,* 494 U.S. at 879, 110 S.Ct. at 1600, 108 L.Ed.2d at 885-886, quoting *Minersville School Dist. Bd. of Edn. v. Gobitis* (1940), 310 U.S. 586, 594-595, 60 S.Ct. 1010, 1012-1013, 84 L.Ed. 1375, 1379.

{¶ 43} The answer in each case as to whether an individual's religious beliefs may excuse compliance with a generally applicable law depends primarily on the level of judicial scrutiny deemed appropriate for review of the constitutional question. Today, the majority decides that Ohio courts shall continue to review such questions using the most exacting scrutiny in our judicial arsenal—the "compelling state interest" standard—and declines to align our jurisprudence with that of the federal courts following *Smith*.

{¶ 44} To support its departure from the Supreme Court's recent free exercise jurisprudence, the majority cites the textual differences between Ohio's Constitution and the First Amendment. And some textual differences certainly exist. But only last year, this court determined that even though the *text* of Section 7, Article I of the Ohio Constitution is "quite different" from the First Amendment, Ohio's religion clauses are, nevertheless, the "approximate equivalent" of those found in the Bill of Rights. *Simmons-Harris v. Goff* (1999), 86 Ohio St.3d 1, 10, 711 N.E.2d 203, 211-212. Accordingly, we adopted the federal *Lemon* test for

Establishment Clause claims asserted under the Ohio Constitution because the *Lemon* test is "a logical and reasonable method by which to determine whether a statutory scheme establishes religion." *Id.* at 10, 711 N.E.2d at 211. See *Lemon v. Kurtzman* (1971), 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745. Ohio's "Free Exercise" Clause should be analyzed according to the *Smith* thinking for the same reason that our *Simmons-Harris* decision applied *Lemon* to Ohio's "Establishment Clause." *Smith* reasoned that the application of the compelling-state-interest test to all free-exercise claimants is neither logical nor reasonable.

{¶ 45} We are accustomed to the application of strict scrutiny in the context of free speech and racial discrimination. When a court strictly scrutinizes racially discriminatory laws or content-based restrictions on speech, the rigorous judicial review produces equal treatment and an unrestricted flow of ideas. *Smith, supra,* 494 U.S. at 885-886, 110 S.Ct. at 1604, 108 L.Ed.2d at 890. As Justice Scalia noted for the majority, both of these results are "constitutional norms." *Id.* On the other hand, "what [strict scrutiny] would produce here—a private right to ignore generally applicable laws—is a constitutional anomaly." *Id*. at 886, 110 S.Ct. at 1604, 108 L.Ed.2d at 890.

{¶ 46} *Smith* noted another anomaly in trying to review free-exercise claims under the compelling-state-interest standard. There are no legal standards by which judges can consider, understand, weigh, and/or measure the particular religious beliefs of each plaintiff. "What principle of law or logic can be brought to bear to contradict a believer's assertion that a particular act is 'central' to his personal faith? * * * Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." *Smith, supra,* 494 U.S. at 887, 110 S.Ct. at 1604, 108 L.Ed.2d at 891. Yet the majority here says that a judge must "first *look at the beliefs of the person* affected by the state action, and *how those beliefs are affected* by the state action. * * * [T]he plaintiff must *show that his religious beliefs are*

*truly held* and that the governmental enactment *has a coercive effect against him in the practice of his religion.*" (Emphasis added.)

{¶ 47} *Smith* also warned that the application of the compelling-state-interest standard to free-exercise claimants could impair the state's ability to enforce what the citizens intend to be universally applicable rules. As the *Smith* court reasoned, "The government's ability to enforce generally applicable prohibitions of socially harmful conduct * * * 'cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.' " *Smith, supra,* 494 U.S. at 885, 110 S.Ct. at 1603, 108 L.Ed.2d at 889-890, quoting *Lyng v. Northwest Indian Cemetery Protective Assn.* (1988), 485 U.S. 439, 451, 108 S.Ct. 1319, 1326, 99 L.Ed.2d 534, 548. "Any society adopting such a system would be courting anarchy, but that danger increases in direct proportion to the society's diversity of religious beliefs, and its determination to coerce or suppress none of them." *Smith, supra,* 494 U.S. at 888, 110 S.Ct. at 1605, 108 L.Ed.2d at 892.

{¶ 48} Of course, the majority's approach accords with our country's tradition of religious freedom. The compelling-state-interest standard shields individuals who suffer from those forms of discrimination that inevitably result from the application of general laws to the diverse members of our increasingly multicultural society. See *id.*, 494 U.S. at 903, 110 S.Ct. at 1613, 108 L.Ed.2d at 902 (O'Connor, J., concurring in judgment). But when we weigh the potential benefits of reviewing free-exercise claims under the compelling-state-interest standard against the shortcomings of such an approach, *Smith*'s analysis seems more judicious. The *Smith* court simply determined that strict scrutiny should be the exception, not the rule—an approach entirely consistent with the limited application of the compelling-state-interest standard in other legal contexts. *City of Boerne v. Flores* (1997), 521 U.S. 507, 514, 117 S.Ct. 2157, 2161, 138 L.Ed.2d 624, 635.

**{¶ 49}** Finally, nothing in *Smith*—if we had adopted its reasoning today—would have prevented Ohio citizens from seeking specific religious accommodations in the General Assembly. Even *Smith*'s staunchest critics concede that legislatures in this country have a long history of granting religious exemptions to otherwise generally applicable laws. See *City of Boerne v. Flores, supra,* 521 U.S. at 558-559, 117 S.Ct. at 2182-2183, 138 L.Ed.2d at 662-663 (O'Connor, J., dissenting, discusses the practice of pre-Constitutional legislatures excusing pacifists such as Quakers and Mennonites from military service). A system that encourages citizens to pursue legislative accommodations to otherwise generally applicable laws intrudes less on the legislative sphere than the rigorous judicial scrutiny of facially neutral laws that today's decision will surely increase.

Conclusion

**{¶ 50}** In *Smith*, the Supreme Court conceded that its refusal to apply strict scrutiny could, at times, disadvantage religious minorities whose belief systems are inadvertently offended by generally applicable laws. *Smith, supra*, 494 U.S. at 890, 110 S.Ct. at 1606, 108 L.Ed.2d at 893. But the *Smith* court preferred a deferential approach to "a system in which each conscience is a law unto itself or in which judges weigh the social importance of all laws against the centrality of all religious beliefs." *Id*. Today, the majority chooses the system expressly rejected in *Smith*. I respectfully dissent because I see the majority's compelling-state-interest standard as "open[ing] the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind." *Id.,* 494 U.S. at 888, 110 S.Ct. at 1605, 108 L.Ed.2d at 892.

————————————