LUKEN, Appellant,

v.

BRIGANO et al., Appellees.

[Cite as *Luken v. Brigano,* 154 Ohio App.3d 531, 2003-Ohio-5116.]

Court of Appeals of Ohio,
Twelfth District, Warren County.

No. CA2003–01–007.

Decided Sept. 29, 2003.

Jeffrey M. Silverstein, for appellant.

Jim Petro, Attorney General, Jack W. Decker and Anne E. Thomson, Assistant Attorneys General, for appellees.

WILLIAM W. YOUNG, Presiding Judge.

{¶ 1} Plaintiff-appellant, Robert Luken, appeals from a judgment of the Warren County Court of Common Pleas granting summary judgment in favor of defendants-appellees, Anthony Brigano, former Warden of the Warren County Correctional Institution ("WCI"), and Reginald Wilkinson, the Director of the Ohio Department of Rehabilitation and Correction ("ODRC"). We affirm the judgment of the trial court.

{¶ 2} From June 1972 until his retirement in July 2002, appellant was an employee of ODRC. Beginning in 1990, appellant worked at WCI as a psychology assistant under the supervision of Dr. James Baron and Dr. Ken Washington. During appellant's employment at WCI, appellee, Anthony Brigano, served as the warden.

{¶ 3} In 1980, in accordance with his spiritual beliefs, appellant stopped cutting his hair. Appellant maintains that his spiritual beliefs are "non-theistic," and that he has identified his hair as a spiritual "totem." Appellant claims that he does not cut his hair, because it symbolizes his spiritual development and serves as a reminder that he must "live simply and avoid excessive pride." Appellant states that he has voluntarily cut his hair only once since 1980, which he claims was for charity.

{¶ 4} In the early 1990s, ODRC instituted a grooming policy, a portion of which provides that male employees' hair must not extend below the bottom of the collar in the back, must not cover the entire ear on the side, and must be styled above the eyebrow in the front. When the grooming policy became effective, Dr. Baron told appellant that he had to get a haircut and provided him with a copy of the grooming policy. Appellant refused and wrote on the acknowledgement of his receipt of the policy that ODRC lacked the authority to implement the policy

based on a collective bargaining agreement. However, appellant did not inform his supervisor that he believed the policy violated his spiritual beliefs.

{¶ 5} As a result of appellant's refusal to comply with the grooming policy, he was given an oral reprimand, a written reprimand, and a one-day suspension. Appellant still did not inform ODRC or WCI that the policy violated his beliefs. After his suspension, appellant cut his hair whenever his supervisors requested him to do so, which occurred approximately every nine months.

{¶ 6} After the Ohio Supreme Court issued its decision in *Humphrey v. Lane* (2000), 89 Ohio St.3d 62, 728 N.E.2d 1039, appellant refused to maintain his hair in accordance with the grooming policy. Based upon his interpretation of *Humphrey*, appellant felt that he was not required to comply with the policy because of his spiritual beliefs.

{¶ 7} In April 2001, Dr. Washington ordered appellant to cut his hair. Appellant refused and asked for an accommodation or waiver pursuant to *Humphrey*. Appellant's request was denied, and appellant still refused to cut his hair. Appellant was given an oral reprimand, a written reprimand, a two-day suspension, a five-day suspension, and a ten-day suspension. For reasons unrelated to this case, appellant voluntarily retired in July 2002.

{¶ 8} On April 23, 2002, appellant filed a complaint against Brigano and Wilkinson, claiming that the ODRC grooming policy violated his right of conscience as guaranteed by Section 7, Article I of the Ohio Constitution, and requesting that the court enjoin appellees from taking any disciplinary action against him. Appellees moved for summary judgment on October 23, 2002, and the trial court granted the motion on December 17, 2002. In its decision, the trial court stated, "Reasonable minds could certainly conclude that Mr. Lukens' beliefs regarding his hair are sincerely held. There can be no issue, however, that they are not in deference to or the mandate of a higher being." Appellant appeals from the trial court's decision, raising the following assignment of error:

{¶ 9} "The common pleas court erred in granting appellee's motion for summary judgment."

{¶ 10} In its decision granting summary judgment, the trial court found that although appellant's beliefs were sincere, they were not religious in nature. Appellant argues on appeal that the trial court erred in granting summary judgment on this basis, because the Ohio Supreme Court recognized a right to an "expression of conscience" in the *Humphrey* decision that is protected from interference by the Ohio Constitution.

{¶ 11} In *Humphrey*, a Native American employed by the ODRC challenged a policy requiring him to keep his hair cut above his ears and collar length or shorter in the back. Id. at 63, 728 N.E.2d 1039. Humphrey argued that the

policy violated his religious beliefs because he wears his hair long as part of his practice of Native American Spirituality. Id. As part of his religious practice, he must walk the "red road" of spirituality and was required to keep his hair long. Id.

{¶ 12} The question before the *Humphrey* court was what standard of review should be applied when reviewing a generally applicable, religion-neutral state regulation that allegedly violates a person's right to free exercise of religion. Id. at 66, 728 N.E.2d 1039. In determining that the regulation must serve a compelling state interest and be the least restrictive means of furthering that interest, the court looked to the language of the Ohio Constitution in comparison with the language of the federal Constitution.

{¶ 13} The Ohio Constitution's Freedom of Religion Clause states: "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience. No person shall be compelled to attend, erect, or support any place of worship, or maintain any place of worship, against his consent; and no preference shall be given, by law to any religious society; nor shall any interference with the rights of conscience be permitted."

{¶ 14} The court found that the Ohio Constitution is distinguished by the phrase "nor shall any interference with the rights of conscience be permitted." Id. at 67, 728 N.E.2d 1039.

{¶ 15} However, in distinguishing the Ohio right to religious freedom from federal protection, the court did not recognize a general "right of conscience" as argued by appellant. Instead, the court found that while the federal right protected the free exercise of religion, the Ohio right was broader. However, this broadened right was in the context of the type of protection afforded, not the religious nature of the right. The court found that while the federal right protects citizens from laws that *prohibit* free exercise of religion, the Ohio Constitution goes a step further and protects citizens even from laws that *interfere* with the right. Id. Thus, the court found that the Ohio right extends beyond laws prohibiting free exercise to laws that "tangentially affect religion." Id. Thus, the expanded right discussed by the court was the freedom from laws that not only prohibit, but also from those laws that interfere with the exercise of a religion, not a recognition of a general right of conscience.

{¶ 16} Because of this broadened right, the court determined that Ohio should apply a different test to neutral, evenly applied government actions. The court then found that a state law interfering with religion must serve a compelling state interest and be the least restrictive means of furthering that interest. The court found that the protection applied "to direct and indirect encroachments upon religious freedom." Id. at 68, 728 N.E.2d 1039.

{¶ 17} The court then turned to the facts of the case and noted that before analyzing the state action with the test discussed, a person must state a prima facie free exercise claim by establishing "that his religious beliefs are truly held and that the governmental enactment had a coercive [effect on] him in the practice of his religion." Id. In that case, the court found there was no dispute that Humphrey had successfully made the required prima facie case. They found that there was no dispute that a central tenet of Native American spirituality was that a man's hair should not be cut unless he was in mourning and that forcing Humphrey to cut his hair would infringe on the free exercise of his religion. Id. at 68–69, 728 N.E.2d 1039. The court then applied the strict-scrutiny standard to the enactment and found that it was not the least restrictive means of furthering the interest. Id. at 69–72, 728 N.E.2d 1039.

{¶ 18} Thus, the issue involved in this case, whether appellant's beliefs are protected as an expression of religion, was not at issue in the *Humphrey* case. The *Humphrey* court's discussion regarding interference with the rights of conscience was in relation to the degree of protection afforded a religious right, not the nature of the religious right itself. Thus, we find that the Ohio Supreme Court has not recognized a general right of conscience separate from the protection afforded to religious rights.

{¶ 19} Prior to the *Humphrey* decision, the Tenth District came to a similar conclusion and found that the Ohio Constitution does not afford "a right of conscience irrespective of and unconnected to religious freedom." *Preterm Cleveland v. Voinovich* (1993), 89 Ohio App.3d 684, 627 N.E.2d 570. The plaintiffs in that case also argued that the freedom-of-religion section of the Ohio Constitution conferred protection to a person's general right of conscience. The Tenth District examined the language of the Constitution and determined that "[t]he first sentence defined the right intended, namely, the 'natural and indefeasible right to worship Almighty God' which precludes an interpretation that a right of conscience unconnected with religion is intended to be protected by this section." Id. at 697, 627 N.E.2d 570. The court determined that the word "conscience" was to be taken in a religious context, not a secular context. Id.

{¶ 20} The court concluded that "the word 'conscience' denotes a sense of moral goodness as to which conduct is right and which is wrong. In a secular sense, such intellectual feelings may vary from person to person, but they are protected by Section 7, Article I, Ohio Constitution, only when predicated upon bona fide religious beliefs, even though the word 'conscience' in a secular sense necessarily includes moral and philosophical views not within the confines of established religion. Such secular concepts of 'conscience' may have some constitutional protection * * *, but such protection is not afforded by Section 7, Article I, Ohio Constitution." Id. at 697, 627 N.E.2d 570.

{¶ 21} Accordingly, because we find that the Ohio Constitution does not confer protection to a general right of conscience, we must next examine whether appellant's "spiritual beliefs" are the type afforded protection from religious interference. As mentioned in the above discussion, a plaintiff must establish a prima facie case of religious discrimination by showing that his religious beliefs are sincerely held and that the government regulation interferes with the practice of his religion. *Humphrey* at 68, 728 N.E.2d 1039.

{¶ 22} A determination of what is a "religious" belief or practice entitled to constitutional protection presents a "most delicate question." *Wisconsin v. Yoder* (1972), 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15. However, "the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." Id. at 215–216, 92 S.Ct. 1526, 32 L.Ed.2d 15. One test used in Ohio to determine whether beliefs are religious in nature is whether a given belief occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God. *State v. Bontrager* (Oct. 18, 1996), Hardin App. No. 6–95–17, 1996 WL 612374, citing *United States v. Seeger* (1965), 380 U.S. 163, 165–166, 85 S.Ct. 850, 13 L.Ed.2d 733. Although this is an encompassing definition, more than a personal or philosophical belief is required. Id. "A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation * * * if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief." *Yoder*, 406 U.S. at 216, 92 S.Ct. 1526, 32 L.Ed.2d 15. In discussing this issue, the United States Supreme Court analogized personal beliefs to that of Thoreau's choice to isolate himself from the social values of his time and found that "Thoreau's choice was philosophical and personal rather than religious, and such belief does not rise to the demands of the Religion Clauses." Id.

{¶ 23} Likewise, we find that appellant's beliefs, while sincerely held, do not rise to the level of religion as required to afford protection under the Ohio Constitution. Appellant testified in a deposition that his beliefs are "non-theistic," which he defines as the belief that morality and conscience have to be an individual choice, without reliance on the authority of a deistic figure or figures. He describes his belief system as an "obligation of individual conscience." His choice of his hair as his "totem" was a personal choice, and he acknowledged that his belief system allows him to choose something else as his totem. A review of appellant's deposition and his "Statement of My Spiritual Development" reveals that appellant's beliefs are based on his own personal and philosophical choices. Thus, we find that appellant's beliefs do not rise to the level of "religious beliefs"

required to fall under the protection of the Ohio Constitution. Appellant's assignment of error is overruled.

Judgment affirmed.

WALSH and POWELL, JJ., concur.